UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
**NEB MORROW, III**,                                           :
                                                               :
                              Petitioner,                      :
                                                               :   **MEMORANDUM DECISION AND**
                                                               :   **ORDER**
              – against –                                      :
                                                               :   18-CV-5765 (AMD) (LB)
                                                               :
**MICHAEL CAPRA**,                                             :
                                                               :
                              Respondent.                      :
                                                               :
-------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

 The *pro se* petitioner, currently incarcerated at Sing Sing Correctional Facility, petitions

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petitioner was convicted after a

jury trial of first-degree robbery, and sentenced to an indeterminate prison term of 21 years to

life.[1]  The petitioner represented himself at trial, but argues that the lawyers who represented him

before trial and on his appeal were ineffective, and that the trial judge should have appointed

different standby counsel.  (ECF No. 1 at 5-38.)  He also argues that he was deprived of his right

to testify before the grand jury, and faults the trial court's decision not to dismiss the indictment

on that basis.  (*Id.* at 38-39.)  In addition, the petitioner claims that the prosecutor concealed

exculpatory evidence, and that the trial prosecutors, police officers and his defense counsel

conspired to convict him.  (*Id.* at 40-48.)  For the reasons that follow, the petition is denied.

---

[1] The judge ordered that the sentence run consecutively to the petitioner's federal sentence of 147 months'
imprisonment for Hobbs Act Robbery, imposed on June 24, 2010 in the Southern District of New York.

## FACTUAL BACKGROUND[2]

### I.     Overview

On October 13, 2009, the petitioner robbed a Brooklyn McDonald's at gunpoint.

Employees followed him as he left the restaurant, and police officers arrested him shortly

thereafter.  The petitioner was charged with Robbery in the First Degree and related charges.

(ECF No. 14 at 3.)

The petitioner represented himself at a jury trial before the Honorable Joel M. Goldberg.

The jury convicted the petitioner of first-degree robbery, and he was sentenced as a persistent

violent felony offender to an indeterminate prison term of 21 years to life.  The Appellate

Division affirmed the judgment of conviction, and the Court of Appeals denied the petitioner's

application for leave to appeal.  *People v. Morrow*, 143 A.D.3d 919 (2d Dep't 2016); *People v.*

*Morrow*, 28 N.Y.3d 1148 (2017).

### II.    Pretrial Proceedings

#### a.    Pretrial Motions and State Habeas Petition

At his arraignment in November of 2009, the petitioner argued that he was deprived of

his right to appear before the grand jury pursuant to New York Criminal Procedure Law

("C.P.L.") § 190.50.[3]  (ECF No. 1 at 6; ECF No. 14-5 at 36.)  Specifically, he claimed that

before his arraignment, his assigned counsel, Clinton Hughes, waived his right to testify before

the grand jury, against his wishes.  (*Id.*)  The Honorable Patricia DiMango appointed David

---

[2] Because the petitioner was convicted, I summarize the facts in the light most favorable to the verdict. *See United States v. Wasylyshyn*, 979 F.3d 165, 169 (2d Cir. 2020) (citing *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012)).

[3] Under New York C.P.L. § 190.50, a person has a right to appear before a grand jury "[w]hen a criminal charge against [that] person is being or is about to be or has been submitted to a grand jury . . . if, prior to the filing of any indictment or any direction to file a prosecutor's information in the matter, he serves upon the district attorney of the county a written notice making such request and stating an address to which communications may be sent."  C.P.L. § 190.50(5)(a).

Jacobs to represent the petitioner; he adopted the petitioner's *pro se* motion, and moved to dismiss the indictment pursuant to C.P.L. § 190.50.  (ECF No. 14-5 at 36-37.)  The Honorable John P. Walsh denied that motion.  (Aug. 19, 2010 P. Tr. 11-12.)[4]  The petitioner claims that he did not learn about the motion, or that it was denied, until January 22, 2010.  (ECF No. 1 at 7.)

In a January 27, 2010 letter addressed to Judge Walsh, the petitioner said that he wanted to represent himself, explaining that Mr. Jacobs did not contact him before filing the C.P.L. § 190.50 motion.  (ECF No. 8 at 9.)  He also said that he planned to "file a habeas corpus to challenge [Judge Walsh's] decision and order of January 22, 2010 as unconstitutional."  (*Id.* at 9.)  On February 11, 2010, the petitioner filed a *pro se* habeas petition arguing that his right to testify before the grand jury was violated, and that he was denied the effective assistance of counsel.  (ECF No. 8 at 13-24; ECF No. 1 at 8.)  Judge Walsh denied the petition in March of 2010.  (Nov. 15, 2010 P. Tr. 11-12.)  The petitioner asserts that Judge Walsh denied the writ because the petitioner was in federal custody at the time.  (Nov. 15, 2010 P. Tr. 5; *see also* ECF No. 1 at 10.)[5]

At a pretrial proceeding before Judge Goldberg on November 12, 2010, the petitioner resubmitted the habeas petition.  (Nov. 12, 2010 P. Tr. 3-4.)  He reasserted his claims about the grand jury, and claimed that both of his lawyers were ineffective: the first for waiving the petitioner's right to testify before the grand jury, and the second for filing a "boiler-plate, un-researched" motion to dismiss without consulting him.  (ECF No. 8 at 31-53.)  The petitioner asked the court to dismiss the indictment, and to permit him to testify before a new grand jury,

---

[4] The transcripts for the pretrial and trial proceedings can be found at ECF Nos. 14-1, 14-2 and 14-3. Parenthetical references containing "P. Tr." refer to the pretrial transcript at ECF No. 14-1.  "T. Tr." refers to the trial transcript spanning both ECF Nos. 14-2 and 14-3.  "S. Tr." refers to the sentencing transcript at ECF No. 14-3.

[5] The court's order does not appear in the record, and thus the basis for the decision is not clear.

which he explained would "place[] [him] in the same position that [he] was in before the constitutional violated occurred." (Nov. 15, 2010 P. Tr. 6; *see also* ECF No. 8 at 51.)

Judge Goldberg denied the petition. (Nov. 15, 2010 P. Tr. 7; ECF No. 1 at 13.) Judge Walsh, a judge of coordinate jurisdiction, denied the petitioner's grand jury claim, and Judge Goldberg explained that he was "not really allowed to review the decision made by another judge." (Nov. 15, 2010 P. Tr. 12-13.) Nevertheless, Judge Goldberg permitted the petitioner to "make a record," explaining, "If you are convicted, that's something that has to be raised on appeal." (*Id.*) The petitioner responded that his lawyer raised the grand jury claim, and "[t]hat's what the writ is about." (Nov. 15, 2010 P. Tr. 13.)

**b.  The Court's *Pro Se* Inquiry**

On August 19, 2010, the petitioner said he wanted to represent himself at trial. (Aug. 19, 2010 P. Tr. 2.) Judge Goldberg conducted an inquiry "so the record shows that it's a voluntary decision," and to ensure that the petitioner was "aware of the risks of self-representation," and "prepared to conduct [himself] properly." (Aug. 19, 2010 P. Tr. 6-7.) In response to the court's questions, the petitioner confirmed that he could read, write, speak and understand English, that he had not been treated for mental illness, that he went to college for one semester, and that he had prior work experience. (Aug. 19, 2010 P. Tr. 7-8.) The petitioner also confirmed that he had enough time to consider whether he wanted to represent himself, and that his decision was voluntary. (*Id.*) Judge Goldberg noted that the petitioner had also represented himself in his federal trial, and described general differences between state and federal trials. (Aug. 19, 2010 P. Tr. 7, 8, 10.) The petitioner said that he understood the trial procedures and legal terms when he represented himself in federal court. (Aug. 19, 2010 P. Tr. 14.)

Judge Goldberg asked if the petitioner was seeking to represent himself because he was dissatisfied with his counsel or because he wanted to represent himself. (Aug. 19, 2010 P. Tr.

4

10.)  The petitioner answered, "Both, actually, Your Honor."  (*Id.*)  Observing that the record should not be made to appear that the petitioner was "being forced to represent [himself] because [he] didn't like [his] attorney," Judge Goldberg asked some additional questions, including about the lawyers in his federal case.  (Aug. 19, 2010 P. Tr. 10-11.)  Judge Goldberg advised the petitioner that "most defendants who represent themselves are not successful" (Aug. 19, 2010 P. Tr. 12), and warned him of the various risks associated with self-representation, which the petitioner said he understood.  (Aug. 19, 2010 P. Tr. 12-15.)  At that point, Judge Goldberg ruled that the petitioner could represent himself (Aug. 19, 2010 P. Tr. 15-16), and appointed Mr. Jacobs to serve as a "standby counsel," in the event that the petitioner needed assistance.  (Aug. 19, 2010 P. Tr. 13.)

On September 22, 2010, the petitioner complained about Mr. Jacobs's earlier representation, and asked the court to appoint him a new standby counsel.  (Sept. 22, 2010 P. Tr. 7, 10.)  Judge Goldberg denied the request, explaining that the petitioner was representing himself, that "Mr. Jacobs is in the background," and that, in any event, "substitut[ing] someone else . . . at this point . . . might wind up delaying the trial."  (Sept. 22, 2010 P. Tr. 11.)

### c.  Discovery Material

The petitioner also told Judge Goldberg that he had not "received any paperwork in this matter."[6]  (Aug. 19, 2010 P. Tr. 8-9.)  Although Mr. Jacobs was "pretty sure" that he had given the petitioner a copy of the indictment and the "open file" discovery, which included the grand jury witness testimony (Aug. 19, 2010 P. Tr. 9), he said that he would give the petitioner another copy.  (*Id.*)

---

[6] The petitioner said at one point that he "basically [was] not even aware of what it is that [he was] being charged with," but knew that he was charged with robbing a McDonald's at 275 Fourth Avenue in Brooklyn on October 13, 2009 at around 9:00 p.m.  (Aug. 19, 2010 P. Tr. 8-9.)

The Assistant District Attorney ("ADA"), Hillary Schaeffer, represented that she had given the petitioner's defense counsel two sets of documents: the open file discovery on March 11, 2010, and additional material on July 19, 2010, including "a 911 disc" and "surveillance video from the event."  (Aug. 19, 2010 P. Tr. 16-17.)  Mr. Jacobs repeated that he was "pretty sure" that the petitioner had these materials:

> I can tell you from the record he has the March 11th packet, he has the CD which I was given, and I believe I have given him the other discovery as well.  There is no reason why I wouldn't have.  I notice a lot of my file originally stapled when I got it from the People [but it] no longer has staples.  That's an indication to me that I took it apart . . . and I'm pretty sure I gave these to Mr. Morrow.  He has an extensive file.  I am just going to ask him to look through that.  If he is missing anything that's referring to today, all he has to do is call me and I will have it ready for him.

(*Id*.)

### d.  Jury Selection

Jury selection began on November 15, 2010.  Judge Goldberg gave standard introductory remarks to the prospective jurors, and outlined the expected schedule for the trial.  (Nov. 15, 2010 P. Tr. 33-34.)  He also addressed whether prospective jurors could be excused, and described the "hardships" that might qualify as excuses:

> [I]t's an inconvenience for all of you to be here. But for some of you, it may be a hardship because you have a family obligation or a business commitment.  I'm not talking about a hardship to your employer.  I'm sure it is a hardship to all of your employers because you are all valuable at work.

(*See* Nov. 15, 2010 P. Tr. 34.)  He further explained that if prospective jurors faced hardships, he could excuse them from trial, but not from jury duty altogether.  (*Id*.)  He added, "If you have to think about it, you don't have a hardship, obviously."  (*Id*.)  The court then excused the prospective jurors who claimed that they had a hardship.  (Nov. 15, 2010 P. Tr. 35.)

### III.    Trial

####    a. The Prosecution's Case

The prosecution called eight witnesses: Officer Arafat Cooper, Lieutenant Clarence Dawson, Detective Darren Duryea, and Renne Peeples, who worked for the New York Police Department's Tapes and Recordings Unit, as well as four McDonald's employee witnesses— Pablo Analuisa, Jermaine Hyppolite, Pamela Kielbowska and Patrick Knowles.  Their testimony established the following facts:

On October 13, 2009, at approximately 9:00 p.m., the petitioner, wearing a dark hoodie,[7] black dress pants and eyeglasses, and carrying a black messenger bag, walked into McDonald's on 275 Fourth Avenue in Brooklyn.  (T. Tr. 155-56.)  There were no other customers in the restaurant, and Pablo Analuisa, the manager, was behind the front counter.  (T. Tr. 154-55.)  The petitioner checked the back seating area, and then walked to the front counter, covering his face with his hand.  (T. Tr. 157.)  Analuisa thought the petitioner was a customer and asked, "Can I help you?"  (*Id.*)  When the petitioner told Analuisa to give him "all the money," Analuisa said, "Excuse me?"  (*Id.*)  The petitioner said, "Didn't you see the fuckin' gun in my hand?"  (*Id.*)  At that point, Analuisa saw that the petitioner was pointing a loaded gun at him.  (T. Tr. 157-58.)  The petitioner directed Analuisa to open two cash registers.  (*Id.*)  Analuisa complied, and put the money in a white McDonald's bag.  (T. Tr. 158.)

As Analuisa was emptying the registers, Jermaine Hyppolite, another employee, came from the kitchen area, and saw the petitioner holding the gun; the petitioner told him not to

---

[7] Analuisa testified that the petitioner's sweatshirt was a "dark color," and that it looked black when he saw the petitioner on the street.  (T. Tr. 156, 194-97.)  In a 911 call, Marcus Row described the sweatshirt as black or brown; Patrick Knowles also called 911, and told the operator that the petitioner was dressed in all black.  (T. Tr. 244-45, 545.)  Two other employees—Pamela Kielbowska and Jermaine Hyppolite—said the petitioner was wearing a "gray hoody."  (T. Tr. 278, 419.)  The officers testified that the petitioner was wearing a gray hoodie when they arrested him.  (T. Tr. 90, 383.)

move.  (T. Tr. 159-60, 418-19).  Analuisa finished putting the money in the bag, and the petitioner grabbed it and fled, heading north on Fourth Avenue toward Union Street.  (T. Tr. 159-60.)[8]

Four other employees—Pamela Kielbowska, Patrick Knowles, James Ortega and Marcus Row—were also working.  Ortega was in the kitchen with Hyppolite (T. Tr. 277), Knowles was taking out the garbage (T. Tr. 214), Kielbowska was at the drive-through window next to the registers (T. Tr. 276-77), and Marcus Row was at the condiment station by the front door.[9]  (T. Tr. 177, 203.)

As soon as the petitioner left, Analuisa pressed a panic button that contacted the police (T. Tr. 160), Hyppolite and Kielbowska called 911 (T. Tr. 160-61, 283, 420-21), and Row stepped outside to see where the petitioner was going, and also called 911.  (T. Tr. 161, 208-09, 413-14.)  After Analuisa and Row pointed out the petitioner to Knowles (T. Tr. 246-48, 272), he and Ortega followed the petitioner down Fourth Avenue, maintaining a distance of approximately 20 feet.  (T. Tr. 161, 218-19, 253, 257, 265.)  Knowles also called 911 as they followed the petitioner.  (T. Tr. 224, 250.)  After the petitioner tried to hail a taxi cab, he went to the subway entrance at the corner of Fourth Avenue and Union Street and took one step down the stairs to the station, but came back out to the street.  (T. Tr. 258-59, 262.)

Meanwhile, Officer Cooper and Lieutenant Dawson were on plain clothes patrol in an unmarked car when they received a call over their radio that a black male wearing a gray hoodie and carrying a black messenger bag had robbed the McDonald's at 275 Fourth Avenue.  (T. Tr.

---

[8] Surveillance video from inside the McDonald's showed a man in a gray hoodie and dark pants, holding a gun and carrying a black bag, approach the counter and direct Analuisa to empty the cash registers.  (T. Tr. 23, 174-79.)

[9] At the time of trial, Row was no longer employed at McDonald's and did not testify.  Video showed that Row "ke[pt] looking back" in the direction of Analuisa and the petitioner during the robbery.  (T. Tr. 179, 213.)

34-36, 338-39.)  They arrived at the restaurant within a few minutes of the robbery, and met

Analuisa in front.  He got in the car, and they drove north on Fourth Avenue.  (T. Tr. 36-38, 163,

340.)  Analuisa saw the petitioner on the corner of Fourth Avenue and Union Street, pointed at

him and screamed, "There he is."  (T. Tr. 100, 163-64, 341.)  He was "positive" that the

petitioner was the same person who had just robbed the store because he was wearing the same

hoodie, and had the same messenger bag and the white McDonald's bag.  (*Id.*)  When the

officers told the petitioner to stop (T. Tr. 39-40, 165, 264, 344), he turned right on Union Street

and ran up the block.  (*Id.*)  As the police chased him, the petitioner tripped and fell,[10] dropping

his gun, messenger bag and the McDonald's bag.  (T. Tr. 41-42, 59, 167, 345-46.)  Knowles

never lost sight of the petitioner, from the time the petitioner left the McDonald's until he was

stopped.  (T. Tr. 272.)

The officers arrested the petitioner, and other officers took him to the 78th precinct (T.

Tr. 57-58), where Cooper and Dawson vouchered the petitioner's gun, a .380 semi-automatic

pistol.  (T. Tr. 59, 65.)[11]  They also vouchered the petitioner's messenger bag and McDonald's

bag, which contained $1,526.58 in bills and coins.  (T. Tr. 45, 355.)  According to a McDonald's

report, $1,528.82 was missing from the registers after the robbery.[12]  (T. Tr. 168-69.)

The prosecutor introduced nine photographs of the petitioner on the night of his arrest.

The first set included photographs that Cooper took for "record-keeping purposes," and "[t]o

show the clothing that he was wearing at the time that the crime was committed."  (T. Tr. 80-

---

[10] Dawson remembered that he "order[ed] [the petitioner] to the ground at gun point."  (T. Tr. 376.)

[11] Tests established the gun was loaded and operable, with one bullet in the chamber and five bullets in
the magazine.  (T. Tr. 126.)

[12] Analuisa testified that the cash register report can be off by a few dollars "[b]ecause sometimes
customers leave their change or sometimes we don't have that much change."  (T. Tr. 170.)

82.)[13]  These photographs, some of which were in color, showed that the petitioner was wearing a gray hooded sweatshirt with black lining.  (T. Tr. 82-83, 85; ECF No. 14-4 at 86.)  According to Cooper, "nothing about [the petitioner's] clothing had changed from the time [Cooper] saw him on 4th Avenue until" the time of these photographs.  (T. Tr. 84.)  In addition, the prosecutor offered into evidence a photograph from the petitioner's mugshot file that showed him from the shoulders up, but not the version that showed his entire body.  (T. Tr. 84-85; ECF No. 14-4 at 77, 86.)  The mugshot photographs showed the petitioner wearing a hoodie with a gray interior and black exterior.  (*Id.*)

**b.  The Defense Case**

The petitioner testified on his own behalf, arguing that "this was a case of mistaken identity."  (T. Tr. 481.)  On October 13, 2009, the petitioner, a painter who was on parole, sold two paintings from his "Bob Marley series" to a woman in Park Slope, whose name he did not remember, for $400 each.  (T. Tr. 455, 477-78, 504, 517.)  He then walked to the subway at Union Street and Fourth Avenue to get home before his 9:00 p.m. curfew.  (T. Tr. 478, 515.)  He was wearing a black jacket at the time.  (T. Tr. 544.)

As he walked to the subway, he tried to hail three taxi cabs.  He then saw "two individuals walking at a brisk pace;" one hid a bag under a car, crossed the street and continued walking.  (T. Tr. 478, 519.)  He heard someone say, "That's him."  When he turned around, two people were running toward him "with their guns out," so he "took off" running.  (*Id.*)  When he realized that they were police officers, he dropped to his knees, put his hands above his head and laid on the ground.  (T. Tr. 479.)  He told the officers that whatever they were looking for was

---

[13] These photographs were admitted as People's Exhibits 7 and 8.  (T. Tr. 82-83.)  Because the prosecutor introduced a smaller and enlarged version of each photograph, eight total photographs were admitted.  (*Id.*)  The set of photographs introduced at Exhibit 7 were in color.  (ECF No. 14-4 at 86.)

under the car where the person had just dropped the bag.  (*Id.*)  The officers "went and retrieved the bag under the car, and what appeared to be the weapon, and placed them down on ground" by the petitioner, handcuffed him, and then took him to the precinct.  (*Id.*)

When they got to the precinct, Cooper told him to take off his jacket, remove the hood, and turn the jacket inside out so that the gray lining was exposed.  (T. Tr. 480, 495-96.)  Cooper also ordered the petitioner to put his "hair on the inside" of his jacket.  (T. Tr. 480.)

The petitioner argued that the prosecution should have called Row and Ortega.  In particular, the petitioner claimed that when Row called 911, he said that the robber was wearing black clothing, and that Row could "verify that [the petitioner] had on a black jacket when they approached me.  Not a gray jacket."  (Nov. 15, 2010 P. Tr. 209-12.)  The prosecutor moved to admit the entirety of Row's 911 call.  (T. Tr. 330-31.)[14]  Judge Goldberg found that the "prosecution wasn't seeking to scare away a defense witness," and admitted the recording.  (T. Tr. 410, 413-14.)

The petitioner also claimed that the prosecutor withheld *Brady* and *Giglio* material because she did not call Ortega, the McDonald's employee who followed the petitioner along Fourth Avenue with Knowles.  (T. Tr. 529-32.)  The petitioner argued that Ortega was "a vital and crucial witness for the defense," because he would have testified that the petitioner "had on a black jacket at the scene of the arrest," which "would have further assisted the defense in proving that the police witnesses, the arresting officer Cooper and Lieutenant Dawson lied[.]"  (T. Tr. 529-30.)  The petitioner moved to reopen the defense case for Ortega's testimony, or "for a full acquittal, . . . since it's obvious that a constitutional violation has occurred in this courtroom and that it was perpetrated by the knowing intention of keeping me in the dark."  (T. Tr. 534.)  ADA

---

[14] Investigators for the prosecution and the petitioner tried to find Row, but could not.  (T. Tr. 268, 330, 408-10.)

Schaeffer responded that Ortega did not make any statements to the police, that she had not been

in contact with him, and that the petitioner did not ask that he be called as a witness; the

petitioner replied, "I didn't even know the name James Ortega until Pablo Analuisa testified."

(T. Tr. 532-33.)  Judge Goldberg denied the petitioner's application.  (T. Tr. 534-35.)

The petitioner argued in summation that evidence established that he was wearing a black

jacket when he was arrested, and that the officers lied when they testified he was wearing a gray

hoodie because they wanted their testimony to match the witnesses' descriptions.  (T. Tr. 544-45,

556-57.)  Citing Analuisa's testimony that the jacket appeared black, the petitioner asserted that

the officers turned his jacket inside out at the precinct.  (T. Tr. 545-46, 556.)  He also argued that

the officers "staged" aspects of the crime scene by "plac[ing] items on the ground" near the

petitioner, and "took pictures of those items, claiming that they fell off my person."  (T. Tr. 551,

557.)

### c.  Verdict and Sentencing

On November 22, 2010, the jury convicted the petitioner of first-degree robbery.  (T. Tr.

652-53.)  On December 13, 2010, Judge Goldberg sentenced the petitioner as a persistent violent

felony offender to an indefinite term of imprisonment of 21 years to life, to run consecutively to

his federal sentence of 147 months' imprisonment.  (S. Tr. 13-15.)

### PROCEDURAL HISTORY

### I.  440.10 Motion

On February 28, 2011, the petitioner moved *pro se* pursuant to C.P.L. § 440.10 to set

aside his conviction.  (ECF No. 14-4 at 2-45.)  He argued that the prosecution, in violation of

*Brady v. Maryland*, 373 U.S. 83 (1963), withheld a photograph from his "mugshot pedigree" file

that showed him wearing a black jacket with gray lining, a photograph that would have shown

that the officers lied about what he was wearing.  (*Id.* at 9-12, 17-19.)  According to the

petitioner, this photograph was taken before Cooper made him turn his jacket inside out.  (*Id.*)

The petitioner also argued that the prosecutor withheld allegedly exculpatory statements from

Marcus Row and James Ortega, and elicited testimony false testimony from the officers.  (*Id.* at

12-22.)  He claimed that because the prosecution suppressed this evidence, he decided not to

testify before the grand jury.  (*Id.* at 22-26.)  He also argued that the prosecution violated the

Fourth Amendment (*id.* at 27-30), and did not give him adequate notice of Cooper's

identification testimony so that he could move to suppress it pursuant to C.P.L. § 710.30.  (*Id.* at

30-31.)  Finally, he argued that the prosecution did not turn over written statements of the four

McDonald's witnesses.  (*Id.* at 38-41.)

Judge Goldberg denied the motion in a June 28, 2011 decision.  (*Id.* at 83-89.)  He found

that there was no *Brady* violation, and that the petitioner "was actually in possession of the

photographs" as demonstrated by a receipt, which showed that the petitioner's counsel received

the petitioner's mugshot on March 11, 2010, before the trial.  (*Id.* at 87-88.)  In addition, the

petitioner conceded that federal prosecutors disclosed the mugshot in connection with his earlier

federal case.  (*Id.*)  Judge Goldberg found that the mugshot was not exculpatory in any event, and

that the petitioner's claim that the officers turned his jacket inside out "defie[d] credulity."  (*Id.*

at 88.)  "The far more likely explanation" was that the petitioner himself turned his jacket inside

out to change his appearance before the mugshot was taken.  (*Id.*)

The court denied the petitioner's Fourth Amendment and identification notice claims as

procedurally barred, and denied his claim that the prosecution withheld witnesses' statements as

unsupported or speculative.  (*Id.* at 88-89.)

The Appellate Division denied the petitioner's motion for leave to appeal Judge

Goldberg's decision.  (ECF No. 14 at 6.)  He moved to renew the 440.10 motion, which Judge

Goldberg denied on June 20, 2012.  (*Id.*)  The Appellate Division denied his application for leave

to appeal the denial of his motion to renew on October 17, 2012.  (*Id.*)  Finally, on September 25,

2015, the petitioner moved to reargue his first 440.10 motion from 2011, raising similar

arguments and further asserting that his conviction should be vacated because the prosecutor

presented false evidence to the grand jury about the color of his jacket.  (*Id.* at 7; *see also* ECF

No. 8 at 194-218.)  Judge Goldberg denied that motion on December 1, 2015.  (ECF No. 14 at

7.)

## II.   Direct Appeal

The petitioner, represented by appellate counsel, appealed his conviction in April 2015.

(ECF No. 14-5 at 2-30.)  He argued that Judge Goldberg did not adequately explain the risks of

self-representation, and that his waiver was not knowing, intelligent and voluntary.  (*Id.* at 17-

24.)  He also claimed that Judge Goldberg excused prospective jurors based upon only "their

own subjective and unquestioned belief of hardship," without questioning them further.  (*Id.* at

25-29.)

In a *pro se* supplemental brief, the petitioner asserted that his first two lawyers were

ineffective: that the first lawyer waived his right to testify before the grand jury, and that the

second filed a "boiler plate" motion to dismiss the indictment without investigating his claims.

(ECF No. 14-6 at 16-25.)  He faulted the trial judge's decision to reject his request for new

standby counsel, which he argued left him "absolutely no choice but to represent [himself]."  (*Id.*

at 25-31.)  He argued that the prosecution committed *Rosario* violations by not providing him

with witness statements "reduced to writing" before trial.  (*Id.* at 31-38.)  Finally, he claimed that

the prosecution presented false evidence to the grand jury, did not obtain and preserve

surveillance footage from the 78th precinct, concealed the existence of "two crucial witnesses,"

altered and concealed photographic evidence, disclosed police reports with false information,

14

vouched for the prosecution's witnesses, misstated the evidence on summation, forced the petitioner to characterize witnesses as "liars," which "was highly prejudicial to [his] defense," and "cover[ed] up the crimes of the police." (*Id.* at 38-67.)

On October 19, 2016, the Appellate Division affirmed the petitioner's conviction. *People v. Morrow*, 143 A.D. 3d 919 (2d Dep't 2016). The court found that the petitioner's waiver of his right to counsel was knowing, voluntary and intelligent. *Id.* at 919. Because the petitioner did not object to the court's *voir dire* procedure, he did not preserve the challenge for appellate review, and in any event, the court found that the trial judge properly exercised discretion in excusing jurors based on claimed hardship. *Id.* at 920.

The court also rejected the claims in the petitioner's *pro se* supplemental brief. *Id.* at 920-21. The court found that his ineffective assistance claims rested on "matters dehors the record which cannot be reviewed on direct appeal." *Id.* The court also rejected his claim that he was entitled to new standby counsel. *Id.* The court held the petitioner's *Rosario* claim was based on matters outside of the record, unpreserved and in any event meritless, that the challenge to the prosecution's summation was unpreserved and meritless, and that any error in the summation was harmless "given the overwhelming evidence of the defendant's guilt." *Id.* at 920-21. The court also rejected the petitioner's claim that the prosecution concealed witnesses' identities, and that "[t]he defendant's remaining contentions in his *pro se* supplemental brief regarding alleged prosecutorial misconduct" were unpreserved and, in any event, meritless. *Id.* at 921.

The New York Court of Appeals denied the petitioner's application for leave to appeal on January 19, 2017. *Morrow*, 28 N.Y.3d at 1148.

### III.  *Coram Nobis* Petition

On April 2, 2018, the petitioner filed a *pro se coram nobis* petition, in which he argued

that his appellate lawyer was ineffective for failing to raise certain challenges on direct appeal.

(ECF No. 14-7 at 2-53.)  He claimed that appellate counsel should have argued that his appointed

lawyers were ineffective.  (*Id.* at 27-42, 47-53.)  He also claimed that instead of "challeng[ing]

the voluntariness of [his] waiver on the clearly weaker grounds that the judge did not make a

thorough inquiry into [his] knowledge of the risks involved with self-representation" (*id.* at 46),

appellate counsel should have argued that the court's denial of his request for new standby

counsel "placed [him] in a dilemma of constitutional magnitude," which left him with no choice

but to represent himself at trial.  (*Id.* at 42-47.)

On September 12, 2018, the Second Department denied the *coram nobis* petition, finding

that the petitioner did not establish that he was denied the effective assistance of appellate

counsel.  *People v. Morrow*, 164 A.D.3d 1263 (2d Dep't 2018).  The Court of Appeals denied his

application for leave to appeal on January 11, 2019.  (ECF No. 14-7 at 86-91); *People v.

Morrow*, 32 N.Y.3d 1175 (2019).

### IV.  Federal Habeas Petition and Post-Petition Motions

On October 4, 2018, the petitioner filed this habeas petition pursuant to 28 U.S.C. § 2254

challenging his state court conviction.  (ECF Nos. 1, 8.)  I imposed a stay while the petitioner's

motion for leave to appeal his *coram nobis* petition was pending, and lifted the stay when the

Appellate Division denied the motion.  (Nov. 6, 2018 & Jan. 30, 2019 Minute Entries.)  On April

26, 2019, the respondent filed its opposition to the habeas petition.  (ECF No. 14.)

On April 27, 2020, the petitioner filed an emergency motion for an order releasing him

from state custody pending my decision on his habeas petition.  (ECF No. 16.)  He argued that

conditions at Sing Sing during the COVID-19 pandemic were dangerous to his health, and that

16

he had "new legal issues" that he needed to exhaust in state court before amending his petition. (*Id.*)  I denied his application for emergency relief on June 17, 2020 (ECF No. 23), and directed him to advise the Court whether he planned to amend his petition or add any new claims.  (*Id.* at 6.)  In a September 14, 2020 letter, the petitioner said that he would not amend his petition. (ECF No. 26.)

In addition, the petitioner moved pursuant to Federal Rule of Civil Procedure 55(a) for default judgment on July 29, 2020 and again on September 23, 2020.  (ECF Nos. 25, 27.)  I denied the petitioner's motions because the respondent had filed a timely response to the petitioner's habeas petition.

## LEGAL STANDARD

A federal court reviewing a habeas petition must not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  This doctrine applies to substantive and procedural state law grounds.  *Id*. at 729-30.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits.  28 U.S.C. § 2254(a).  A federal court may not issue a writ of habeas corpus unless the state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).  "[R]eview under § 2254(d)(1) is limited to the record that

was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

"When a state court" "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment," "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).  For example, "a state court ruling simply that a claim is 'without merit' constitutes an adjudication on the merits of that claim." *Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006).  In such a case, "the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent." *Sellan*, 261 F.3d at 311-12.

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id*. at 412-13.  The court reviews the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000).  The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

A petitioner can seek federal habeas corpus relief only after he exhausts his state court remedies and gives the state court a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

The petitioner argues that the lawyers who represented him between arraignment and trial were ineffective, and that his appellate lawyer was ineffective because she did not raise certain challenges on direct appeal. (ECF No. 1 at 15-39.) He faults the trial court's refusal to dismiss the indictment on the ground that he was denied a right to appear before the grand jury, which he says is further proof of his appellate lawyer's ineffectiveness. (*Id.* at 38-39.) In addition, he reasserts the claims in his 440.10 motion and in his *pro* se supplemental brief on direct appeal that the prosecutor altered and concealed exculpatory evidence. (*Id.* at 40-47.) He maintains that his counsel conspired with police officers and prosecutors to convict him. (*Id.* at 46.)

## I. Ineffective Assistance of Pretrial Counsel

The petitioner claims that two of his assigned lawyers who represented him before trial were ineffective. According to the petitioner, his first lawyer waived his right to testify before the grand jury without his permission, and his second lawyer, who did not contact him for "112 days," filed a deficient motion to dismiss and did not file a pretrial discovery motion that would have uncovered exculpatory evidence. (*Id.* at 15-25.) He argues that "prejudice . . . must be presumed," and that he was denied representation during "critical" stages before trial. (*Id.* at 17, 24.)

To meet the exhaustion requirement under 28 U.S.C. § 2254(b), a petitioner must present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition. *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990) (per curiam). The petitioner did not make these claims in his 440.10 motion. (ECF No. 14-4 at 2-45.) Although he raised the arguments for the first time in his *pro se* supplemental brief on direct appeal (ECF No. 14-6 at 15-25), the Appellate Division appropriately determined that it was not the proper forum to review the claims, because they were based on facts that were not on the record. *Morrow*, 143 A.D.3d at 920.[15] The petitioner discussed the claims in his *coram nobis* petition as bases for his claim that appellate counsel was ineffective (ECF No. 14-7 at 27-42, 47-53), but that does not satisfy the exhaustion requirement. *Turner v. Artuz*, 262 F.3d 118, 123-24 (2d Cir. 2001) (holding underlying claims to ineffective appellate counsel claim could not be exhausted through *coram nobis* petition). Accordingly, I find that the petitioner did not adequately exhaust his ineffective assistance of counsel claims.

Because this petition contains claims that are both unexhausted and exhausted, it is considered a "mixed" petition, which "ordinarily must be dismissed unless the petitioner (1)

---

[15] When the petitioner complained about his lawyers, Judge Goldberg allowed him to "make a record" and advised him to raise the issues on appeal if he were convicted. (Sept. 22, 2010 P. Tr. 7-11; Nov. 15, 2010 P. Tr. 3-7, 12-13.) However, aspects of the petitioner's claims depended on facts outside of the record. For example, whether Mr. Hughes failed to conduct a "proper investigation" before waiving the petitioner's right to a grand jury appearance (ECF No. 1 at 22), or whether Mr. Jacobs consulted with the petitioner between arraignment and trial (*id.* at 21-22), are based on facts that were not on the record. Where, as here, "a [petitioner] presents a mixed claim of ineffective assistance that depends, in part, upon matters that do not appear on the record," courts find that the claims are properly brought in a 440.10 motion, rather than on direct appeal. *People v. Maxwell*, 89 A.D.3d 1108, 1109 (2d Dep't 2011); *see also People v. Peque*, 22 N.Y.3d 168, 202 (2013) ("Where a defendant's complaint about counsel is predicated on factors such as counsel's advice or preparation that do not appear on the face of the record, the defendant must raise his or her claim via a 440.10 motion."); *People v. Johnson*, 81 A.D.3d 1428, 1428 (4th Dep't 2011) ("Several of the alleged instances of ineffective assistance . . . , e.g., that . . . that her attorney did not conduct a proper investigation, are based on matters outside the record on appeal and thus must be raised by way of a motion pursuant to CPL article 440."). For these reasons, the Appellate Division properly found that direct appeal was not the appropriate avenue for pursuing the claims.

meets the criteria for a 'stay and abeyance' while the petitioner exhausts his claims in state court, or (2) agrees to delete the unexhausted claims." *Gray v. Ercole*, No. 08-CV-3300, 2008 WL 5082868, at *3 (E.D.N.Y. Nov. 25, 2008) (citing *Rose v. Lundy*, 455 U.S. 509, 522 (1982)); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Additionally, a district court has discretion to deny unexhausted claims on the merits.  28 U.S.C. § 2254(b)(2).  A stay may be granted only if the petitioner shows "good cause for his failure to exhaust," that the "unexhausted claims are potentially meritorious," and that he did not "engage[] in intentionally dilatory litigation tactics." *Rhines*, 544 U.S. at 278; *see also id.* at 277 (a stay is improper when "the unexhausted claims are plainly meritless").  Even if a "stay and abeyance is inappropriate," a district court reviewing a petition that includes both exhausted and unexhausted claims "should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief." *Id.* at 278.

As an initial matter, I decline to exercise my discretion to dismiss the claims on the merits.  28 U.S.C. § 2254(b)(2).  Although the petitioner's claims do not appear to be meritorious,[16] it would be premature to decide them before the petitioner has exhausted them in state court.  Indeed, the petitioner could raise his claims in a second 440.10 motion. *See Campos v. Smith*, No. 15-CV-6580, 2017 WL 1025850, at *2 (E.D.N.Y. Mar. 15, 2017) ("If a petitioner's

---

[16] For example, the petitioner's claims about the grand jury do not state a federal claim, as "there is no federally-cognizable ineffective assistance claim concerning advice regarding the state grand jury process." *Payton v. Racette*, No. 11-CV-1260, 2015 WL 9581877, at *8 (E.D.N.Y. Dec. 30, 2015); *Davis v. Mantello*, 42 F. App'x 488, 491 n.1 (2d Cir. 2002) ("A defendant's right to testify before the grand jury is not a constitutional right; rather, it is a [state] statutorily created right," and "New York courts have consistently held that counsel's failure to ensure that the defendant testifies before the grand jury does not amount to ineffective assistance of counsel.") (summary order).  In addition, the claim that a different lawyer should have gotten precinct video footage is almost surely baseless, since there is no indication that this evidence exists, let alone that it would show the petitioner "being escorted into and within the precinct . . . wearing a black jacket," as the petitioner claims.  (ECF No. 1 at 17-18.) Similarly questionable is the petitioner's claim that counsel acted unreasonably because he filed a C.P.L. § 190.50 motion to dismiss without "communicating" with the petitioner.  (*Id.* at 21.)

claims are outside the record, then he may exhaust them by bringing a motion to vacate the judgment in the trial court under C.P.L. § 440.10 . . . . There is no time limit within which an individual must bring a § 440.10 motion." (citations omitted)).  If I were to dismiss the petition entirely, the petitioner could not re-file a federal habeas petition because the one-year AEDPA statute of limitations will have run.  28 U.S.C. § 2244(d)(1).[17]  Therefore, dismissal would likely bar the petitioner from filing another petition after he exhausted his claims in state court.

I next consider whether a stay is appropriate.  *Rhines* requires a petitioner to demonstrate that "good cause" exists for the failure to exhaust, and that the unexhausted claims are not "plainly meritless."  544 U.S. at 277.  Courts in this Circuit have determined that good cause "requires a showing of either (1) some factor external to the petitioner [that] gave rise to the default or (2) reasonable confusion, which is more forgiving and incorporates the petitioner's subjective reasons for the delay in seeking state relief."  *Jeffrey v. Capra*, No. 20-CV-232, 2020 WL 4719629, at *2 (E.D.N.Y. Aug. 12, 2020).  "A lack of knowledge of legal procedures, in itself, is insufficient to find 'good cause.'"  *McCrae v. Artus*, No. 10-CV-2988, 2012 WL 3800840, at *10 (E.D.N.Y. Sept. 2, 2012) (quoting *Garcia v. Laclair*, No. 06-CV-10196, 2008 WL 801278, at *4 (S.D.N.Y. Mar. 24, 2008)).

Because the petitioner does not explain why he did not exhaust his claims before he filed this petition, I find that he has not demonstrated good cause for a stay.  The petitioner neither asks for a stay to exhaust his claims, nor presents information that would allow me to make a

---

[17] Under AEDPA, the petitioner has one year from the day his conviction becomes final to file his habeas petition.  28 U.S.C. § 2244(d)(1).  The limitations period began to run on or about April 19, 2017—90 days after the January 19, 2017 denial of his motion for leave to appeal from the Appellate Division's order affirming his conviction.  *Morrow*, 28 N.Y.3d at 1148.  The petitioner tolled the limitations period on April 2, 2018 when he filed his *coram nobis* petition, leaving 17 days remaining on the one-year period.  The period began to run again on or about January 11, 2019, when the Court of Appeals denied his motion for leave to appeal.  Filing a federal habeas petition does not toll the limitations period, and the Court is not aware of any ongoing state proceedings that would otherwise toll it.

good cause determination under *Rhines*.  Moreover, the petitioner was on notice at least by May 11, 2016 that the respondent took the position that his ineffective assistance claims rested on issues outside of the record.  (ECF No. 14-6 at 4-5 (arguing that the petitioner's "claim of ineffective assistance of counsel relies, in part, upon facts *dehors* the record").)  In its October 19, 2016 order denying the claims, the Appellate Division held that his "contentions" about the lawyers who represented him before trial "concern matter dehors the record which cannot be reviewed on direct appeal."  *Morrow*, 143 A.D.3d at 920.  Accordingly, the petitioner was on notice that his claims might be unexhausted, and he does not explain why he did not exhaust them.  A stay is not appropriate on this record.  *See Spurgeon v. Lee*, No. 11-CV-00600, 2011 WL 1303315 at *3 (E.D.N.Y. Mar. 31, 2011) (denying stay as to unexhausted claims because "petitioner offers no explanation, let alone asserts 'good cause,' as to why he did not previously raise his . . . claim in state court").

If a petitioner is ineligible for a stay, and "dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief," a habeas court "should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims . . . ."  *Rhines*, 544 U.S. at 278 (citation omitted).  If the petitioner did not drop his unexhausted claims so that I can review the balance of the petition, the petition would be dismissed, and it would be untimely if the petitioner refiled it following dismissal.  I assume that the petitioner would prefer that his unexhausted claims be stricken, and that I review the rest of his claims on the merits.  Accordingly, I treat the unexhausted claims as if the petitioner had deleted them from the petition.  *See Harris v. LaManna*, No. 17-CV-80, 2020 WL 1332104, at *15 (E.D.N.Y. March

23, 2020); *Johnson v. Kirkpatrick*, No. 11-CV-1089, 2011 WL 3328643, at *14 (S.D.N.Y. Aug. 3, 2011).[18]

## II.   Ineffective Assistance of Appellate Counsel

As he did in his *pro se coram nobis* petition, the petitioner argues that appellate counsel was ineffective because she did not make certain challenges on direct appeal, and focused on "two very weak issues:" the trial judge's process for excusing prospective jurors during jury selection, and the judge's advice to him on the risks of proceeding *pro se.*  (ECF No. 1 at 29-39; ECF No. 14-5 at 2-29; ECF No. 14-7 at 2-53.)  The Appellate Division rejected the petitioner's complaints on the merits, finding that he "failed to establish that he was denied the effective assistance of appellate counsel."  *Morrow*, 164 A.D.3d at 1263 (citing *Jones v. Barnes*, 463 U.S. 745 (1983) and *People v. Stultz*, 2 N.Y.3d 277 (2004)).

This determination was not an unreasonable application of clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  *Strickland v. Washington* governs ineffective assistance of counsel claims, 466 U.S. 668 (1984), including claims that appellate counsel was ineffective, *see Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985).  To prevail, a petitioner must establish: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 688, 694.

The first prong requires the petitioner to establish that his counsel's performance was "so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the

---

[18] Under similar circumstances, courts "assume that the petitioner 'would prefer the Court to consider the majority of his claims, rather than dismiss the entire Petition outright and risk being barred from raising any of those claims again in federal court.'"  *McCrae*, 2012 WL 3800840, at *10 & n.12 (quoting *Reyes v. Morrisey*, No. 07-CV-2539, 2010 WL 2034531, at *9, *16 (S.D.N.Y. Apr. 21, 2010), *report and recommendation adopted*, 2010 WL 2034527 (S.D.N.Y. May 19, 2010)) (collecting cases).

wide range of professionally competent assistance.'" *Gonzalez v. United States*, 722 F.3d 118,

130 (2d Cir. 2013) (quoting *Strickland*, 466 U.S. at 690).  This test may be met by showing that

appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly

and significantly weaker."  *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (quoting *Mayo v.

Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)).  However, appellate counsel does not have a duty

to raise every non-frivolous issue that could be raised.  *Barnes*, 463 U.S. at 754.

The second prong requires that the petitioner establish that his counsel's "deficient

performance prejudiced the defense" such that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 687, 694.  "A reasonable probability is one that is sufficient to undermine

confidence in the outcome, which requires a substantial, not just conceivable, likelihood of a

different result." *Jackson*, 763 F.3d at 153 (internal quotation marks and citation omitted).  The

"petitioner must show that, had his claim been raised on appeal, there is a reasonable probability

that it would have succeeded before the state's highest court."  *Dolce*, 789 F.3d at 311 (citing

*Claudio v. Scully*, 982 F.2d 798, 805 (2d Cir. 1992)).

As in all ineffective assistance of counsel claims, the court begins with "a strong

presumption that counsel's conduct f[ell] within the wide range of professional assistance," a

presumption that the petitioner bears the burden to overcome.  *Strickland*, 466 U.S. at 689.

Moreover, "[w]hen evaluating an ineffective assistance claim under § 2254(d), [the Court's]

review is 'doubly deferential'" because the deferential *Strickland* standard is applied "through

the deferential lens of § 2254(d)."  *Jackson*, 763 F.3d at 153.  In such a case, "the question is not

whether counsel's actions were reasonable.  The question is whether there is any reasonable

argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

In faulting his appellate lawyer's performance, the petitioner claims she should have argued (1) that his lawyers were absent or ineffective "during the critical post-arraignment period, where challenges to the indictment and pretrial motions are filed," and (2) that the trial judge should have appointed a different standby counsel.  (ECF No. 1 at 29-39.)

Appellate counsel's decision to omit these claims was not unreasonable under *Strickland*. The trial judge allowed the petitioner to "make a record" about the alleged inadequacy of his assigned counsel and told him he could raise the issue on appeal if he were convicted.  (*See* Sept. 22, 2010 P. Tr. 7-11; Nov. 15, 2010 P. Tr. 3-7, 12-13; *see also* ECF No. 1 at 31-32.)  However, as explained above, the petitioner's claims about his previous lawyers depended, at least in part, on facts outside of the record, and should have been brought in a motion to vacate his conviction pursuant to section 440.10.  *See Maxwell*, 89 A.D.3d at 1109; *Peque*, 22 N.Y.3d at 202; *People v. Johnson*, 81 A.D.3d at 1428.  When the petitioner raised these claims in his *pro se* supplemental brief on direct appeal (ECF No. 14-6 at 16-25), the Appellate Division rejected them for this reason.  *Morrow*, 143 A.D.3d at 920.  Under these circumstances, the appellate counsel's decision fell "within the wide range of reasonable professional assistance."  *Hemstreet v. Greiner*, 367 F.3d 135, 141 (2d Cir. 2004) (quoting *Strickland*, 466 U.S. at 689), *vacated on other grounds*, 378 F.3d 265 (2d Cir. 2004).  Moreover, because the claims appear to depend on matters outside of the record, the petitioner cannot establish a "reasonable probability that [they] would have been successful" had counsel raised them.  *Henderson*, 13 F.3d at 534.  Appellate counsel cannot be faulted for failing to advance claims that should have been raised in a 440.10 motion.

Nor was appellate counsel ineffective for omitting the petitioner's "dilemma of constitutional magnitude claim" (ECF No. 1 at 37), which, liberally construed, appears to be the petitioner's claim that he was entitled to a different standby counsel, even though he decided to represent himself. (Sept. 22, 2010 P. Tr. 7-11.) The petitioner made this argument in his *coram nobis* petition, and in his *pro se* supplemental brief on direct appeal. (ECF No. 14-7 at 42-47; ECF No. 14-6 at 25-31.)

Appellate counsel cannot be faulted for declining to raise this claim, because it has no merit. Once a defendant knowingly and voluntarily waives his right to counsel, he has no Sixth Amendment right to standby counsel. *See United States v. Archambault*, 740 F. App'x 195, 199 (2d. Cir. 2018) (summary order); *United States v. Morrison*, 153 F.3d 34, 55 (2d Cir. 1998) (finding that a defendant does not have a "constitutional right to standby counsel"); *People v. Simmons*, 155 A.D.3d 782, 783 (2017) ("[A] defendant who elects to exercise the right to self-representation is not guaranteed the assistance of standby counsel during trial." (citations omitted)). A court's decision to appoint standby counsel is "discretionary." *See Archambault*, 740 F. App'x at 199; *see also Simmons*, 155 A.D.3d at 783 (describing "the assignment of standby counsel [as] a matter of trial management" under New York law). On August 19, 2010, after determining that the petitioner's waiver was knowing, voluntary and intelligent, the court allowed the petitioner to represent himself, and appointed David Jacobs as standby counsel. (Aug. 19, 2010 P. Tr. 13, 15-16). About a month later, the petitioner requested a different standby counsel. (Sept. 22, 2010 P. Tr. 7 ("I am very uncomfortable with [Mr. Jacobs] being my standby counsel. I was thinking that it would be more appropriate were I to ask the court to see if I could be granted a pro bono counsel as a standby.").) Notably, the petitioner did not withdraw his request to represent himself or even express any hesitation about his decision.

(Sept. 22, 2010 P. Tr. 1-11.)  Judge Goldberg denied the request for a new lawyer, because the petitioner had already waived his right to counsel and because finding another standby counsel would delay the trial.  (Sept. 22, 2010 P. Tr. 11.)  The trial court's decision was an appropriate exercise of discretion, and did not violate the petitioner's constitutional rights.  *Archambault*, 740 F. App'x at 199; *Simmons*, 155 A.D.3d at 783.

Appellate counsel's representation fell within the bounds of sound, professional representation.  She filed a 25-page brief in which she focused on two issues: whether the petitioner's waiver was knowing and intelligent, and whether the court's process for excusing prospective jurors for hardships was proper.  (ECF No. 14-5 at 2-29.)  While the Appellate Division ultimately rejected these arguments, *Morrow*, 143 A.D.3d at 919-20, they were not "clearly and significantly weaker" than the meritless arguments that the petitioner identifies.  *Henderson*, 13 F.3d at 533.  Accordingly, there is no basis for a claim of ineffective assistance of appellate counsel.

## III.    Dismissal of the Indictment

In his third ground for relief, the petitioner claims that the trial judge should have dismissed the indictment.  (ECF No. 1 at 38-39.)  The trial court denied the petitioner's state habeas petition because Judge Walsh had already ruled against the petitioner.  (Nov. 15, 2010 P. Tr. 12-13.)  The petitioner argues the "trial court's ruling was contrary to clearly established law . . . as the indictment was supposed to have been dismissed at the State level."  (ECF No. 1 at 39.)  According to him, appellate counsel should have raised this issue on appeal, and her failure to do so is "more evidence" that she was ineffective.  (*Id.*)

Although he maintains that he "brought this issue up in [his] appellate brief" (ECF No. 1 at 39), the petitioner did not challenge the judge's failure to dismiss the indictment on direct appeal, even though the facts underlying the claim appear in the record.  (ECF No. 14-5 at 2-30;

28

ECF No. 14-6 at 2-67.)  Section 440.10(2)(c) of the C.P.L. prohibits relief on a claim that could

have been raised on appeal, but was not.  An unexhausted claim that a defendant failed to raise

on appeal "should be deemed exhausted, because [it is] now procedurally barred from

presentation to that court."  *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991).

      In any event, there is no merit to the petitioner's claim.  A defect in a state grand jury

proceeding is rendered harmless if there is a conviction by a jury at trial.  *See Lopez v. Riley*, 865

F.2d 30, 32 (2d Cir. 1989) (holding that claims concerning state grand jury proceedings are

precluded from habeas review because "any error in the grand jury proceeding was rendered

harmless beyond reasonable doubt by the petit jury's guilty verdict").  This is true even where

the claimed defect is the waiver of the petitioner's right to testify in front of the grand jury.  *See*

*Turner v. Fischer*, No. 01-CV-3251, 2003 WL 22284177, at *6 (E.D.N.Y. Aug. 20, 2003) (Even

"[a]ssuming . . . counsel waived [petitioner's] right to appear before the grand jury without

petitioner's permission, petitioner cannot demonstrate that he was prejudiced thereby.  He was

afforded a jury trial and was convicted by a petit jury after testifying before it.  Any prejudice

suffered by petitioner was rendered harmless by his conviction." (citing *Riley*, 865 F.2d at 32)).[19]

---

[19] Using the same reasoning, courts have dismissed challenges to a trial court's failure to dismiss an indictment based on a defective grand jury proceeding.  *See, e.g., Acevedo v. Superintendent*, No. 16-CV-0594, 2018 WL 1326080, at *6-7 (N.D.N.Y. Feb. 16, 2018), *report and recommendation adopted*, 2018 WL 1319017 (N.D.N.Y. Mar. 13, 2018).

Accordingly, appellate counsel was not ineffective for failing to pursue the claim on appeal, and habeas review is not available.[20]

## IV.    Prosecutorial Misconduct

The petitioner claims that the prosecutor altered and concealed evidence—the mugshot showing him wearing a black jacket at the precinct.  (ECF No. 1 at 40-47.)  The petitioner contends he was thus "depriv[ed] . . . of irrefutable evidence that the arresting officer Arafat Cooper, perjured himself at trial and fabricated arrest evidence against [the petitioner] by turning [the petitioner's] jacket inside out and making [him] pose for incriminating photos in the back of the precinct."  (*Id.* at 40.)  The petitioner also faults the prosecutor for not calling Marcus Row as a witness, because Row said in his call to 911 that the petitioner was wearing a black jacket.  (*Id.* at 45; T. Tr. 330.)  The petitioner alleges a conspiracy among the prosecution, the police officer witnesses and his assigned defense "to present perjured testimony at [his] Grand Jury and at [his] Trial, and to prevent [him] from obtaining evidence of such," violating his due process right to a fair trial.  (*Id.* at 46.)[21]

Except for the claim about the alleged conspiracy among the prosecution, police officers, and his counsel, the petitioner presented these claims in his 440.10 motion.  (ECF No. 14-4 at 2-45.)  He asserted all of them—including the alleged conspiracy—in his *pro se* supplemental brief

---

[20] Nor was appellate counsel ineffective for failing to challenge Judge Goldberg's decision to deny the petitioner's renewed application about the grand jury.  Judge Goldberg explained that he did not have the power to overrule the decision of Judge Walsh, a judge of coordinate jurisdiction, who had already ruled against the petitioner.  (Nov. 15, 2010 P. Tr. 12 ("Judge Walsh denied the motion . . . . I'm not really allowed to review the decision made by another judge."); *id.* 13 (denying the petition because Judge Walsh already "ruled against [the petitioner]" on whether "a denial of [the petitioner's] right to testify in the grand jury is not cured by a trial")).)  Therefore, the petitioner cannot establish a "reasonable probability" that his claim would have been successful on appeal.  *See Henderson*, 13 F.3d at 534.

[21] In a different section of his petition about his pretrial counsel, the petitioner asks the Court to "assist" him in bringing charges against the trial prosecutors, the two police officers who testified at his trial and his former defense attorney.  (ECF No. 1 at 18-19.)  This is not relief that a court can provide.

on direct appeal.  (ECF No. 14-6 at 2-67.)  In rejecting the petitioner's allegations of

prosecutorial misconduct, the Appellate Division held they "are unpreserved for appellate

review, and in any event, without merit."  *Morrow*, 143 A.D.3d at 921 (citation omitted).

Federal courts are precluded from "review[ing] questions of federal law presented in a

habeas petition when the state court's decision rests upon a state-law ground that 'is independent

of the federal question and adequate to support the judgment.'"  *Cone v. Bell*, 556 U.S. 449, 465

(2009) (quoting *Coleman*, 501 U.S. at 729 (1991)).  "If a state court has found that a claim is

unpreserved for appellate review and then ruled 'in any event' on the merits, this determination

constitutes an adequate and independent procedural bar."  *Roberts v. Smith*, No. 10-CV-4264,

2010 WL 5288198, at *2 (E.D.N.Y. Dec. 14, 2010) (citing *Glenn v. Bartlett*, 98 F.3d 721, 724-

25 (2d Cir. 1996)); *see also Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) ("[F]ederal

habeas review is foreclosed when a state court has expressly relied on a procedural default as an

independent and adequate state ground, even where the state court has also ruled in the

alternative on the merits of the federal claim.").

When a state court's decision is based on independent and adequate state grounds, habeas

review is prohibited, unless the petitioner can establish either cause for and prejudice from the

default, or his actual innocence.  *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (citing

*Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)); *Gupta v. United States*, 913 F.3d 81, 84 (2d Cir.

2019) (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1997)).  The petitioner can show neither.

"Actual innocence means factual innocence, not mere legal insufficiency."  *Bousley v.*

*United States*, 523 U.S. 614, 615 (1998).  There is compelling evidence of the petitioner's guilt.

The petitioner was arrested moments after robbing employees at McDonald's.  The store

manager identified him to the police as the person who had just robbed him at gunpoint; a

31

witness who never lost sign of him also identified him.  (T. Tr. 163-64, 272, 341). When officers arrested the petitioner, he had a black handgun and a white McDonald's plastic bag with the proceeds of the robbery.  (T. Tr. 41, 168-69, 348, 355.)  He was also wearing a gray hoodie and carrying a black messenger bag, as McDonald's surveillance video showed, and as multiple McDonald's employees, who witnessed the robbery, observed. (T. Tr. 90, 174-79, 278, 383, 419.)  The petitioner has not asserted any cause for the procedural default.  Accordingly, the petitioner's claims about prosecutorial misconduct are procedurally barred.

In any event, the claims do not have merit.  Construing the petition to "raise the strongest arguments" it suggests, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006), I interpret the petitioner's claims to be that the prosecution suppressed exculpatory evidence in violation of *Brady*, and that it knowingly obtained a conviction through false evidence and testimony.  *See Napue v. Illinois*, 360 U.S. 264 (1959).

Under *Brady*, the prosecution must disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment.'"  *United States v. Bagley*, 473 U.S. 667, 667 (1985) (quoting *Brady*, 373 U.S. at 87).  To establish a *Brady* violation, a petitioner "must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice."  *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (quoting *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)) (internal quotation marks omitted). Evidence is not "suppressed" for purposes of *Brady* if the defendant "'either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'"  *United States v. Barcelo*, 628 F. App'x 36, 39 (2d. Cir. 2015) (summary order) (quoting *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006)).

The petitioner does not assert a plausible *Brady* claim.  First, there is no evidence that the prosecution withheld evidence from him.  At trial, the prosecutor introduced an enlarged photograph showing the petitioner's face and shoulders; she acknowledged in an affidavit to the trial court that she did not offer the full body photograph, which showed that he was wearing a jacket with a black exterior and gray interior.  (ECF No. 14-4 at 76-77.)[22]  As Judge Goldberg found in denying the 440.10 motion, both versions of the mugshot were made available to the petitioner before trial, both as part of discovery in this case and in his earlier federal case.  (Aug. 19, 2010 P. Tr. 9-17; ECF No. 1 at 40; ECF No. 14-4 at 87-88.)  Even if the petitioner could establish that the photograph was not disclosed to him, he cannot show any resulting prejudice, given the strength of the evidence against him.

Nor was the prosecutor's failure to call Row as a witness a *Brady* violation or prosecutorial misconduct.  First, investigators for both the prosecution and the defense tried to find Row, and could not.  (T. Tr. 268, 330, 408-10.)  Moreover, Judge Goldberg determined that "prosecution wasn't seeking to scare away a defense witness," and admitted the recording of Row's 911 call, so the jury was aware that Row told the 911 operator that the petitioner was wearing a "black or brown" sweatshirt.  (T. Tr. 330-31, 410, 413-14, 545.)

Nor can the petitioner establish that the prosecution conspired to secure his conviction through perjured police officer testimony.  "The threshold question is whether the witness in fact committed perjury."  *McCants v. Hallenback*, No. 13-CV-5587, 2014 WL 4638836, at *6 (E.D.N.Y. Sept. 16, 2014) (citing *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001)); *Black v. Rock*, 103 F. Supp. 3d 305, 317 (E.D.N.Y. 2015) ("The petitioner has the burden

---

[22] The prosecutor stated that she "did not make a conscious decision to refrain from admitting the Mugshot Pedigree photograph of [petitioner's] entire body because it depicted [petitioner] wearing a jacket with a black exterior."  (ECF No. 14-4 at 77.)

of demonstrating, by a preponderance of the evidence, that the witness committed perjury." (internal quotation marks and citation omitted)).  If a petitioner can meet that threshold requirement, "a conviction must be set aside if 'the prosecution knew, or should have known, of the perjury,' and 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *Smith v. Herbert*, 275 F. Supp. 2d 361, 367 (E.D.N.Y. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

Cooper and Dawson testified that the petitioner was wearing a gray hoodie when they arrested him.  (T. Tr. 90, 383.)  Cooper also testified that he did not turn the petitioner's jacket inside out before photographing him at the precinct.  (T. Tr. 84, 108.)  The petitioner has not established by a preponderance of the evidence that either Cooper or Dawson committed perjury.  Even if he had, he has not established that the prosecutor knew the testimony was false.  Indeed, the police testimony was consistent with that of other McDonald's employees (T. Tr. 278, 419), and with the surveillance video.  (T. Tr. 23, 174-79.)  In any case, given the considerable evidence of the petitioner's guilt, there is no reasonable likelihood that the testimony affected the jury's verdict.

Accordingly, the petitioner's request for habeas relief is denied.

## CONCLUSION

For these reasons, the petition for a writ of habeas corpus is denied in its entirety.  The

claims for ineffective assistance of pretrial counsel are deleted from the petition.  The case is

dismissed.  A certificate of appealability will not be issued.  *See* 28 U.S.C. § 2553(c).

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
         March 31, 2022